| | |
|---|---|
| **From:** | Kathy Summers |
| **To:** | Melinda Driscoll |
| **Cc:** | Hallee Frandsen; Kristi Staples |
| **Subject:** | Lake v. Core Civic |
| **Date:** | Monday, July 25, 2022 5:29:00 PM |
| **Attachments:** | CoreCivic Defendants" Expert Witness Disclosure.pdf |

Attached please find **CoreCivic Defendants' Expert Witness Disclosure** in the above-referenced matter. A copy will follow via USPS.

Sincerely,

**Kathleen Summers**

Legal Assistant

kathys@bkbh.com

www.bkbh.com

Browning, Kaleczyc, Berry & Hoven, P.C.

800 N. Last Chance Gulch, Ste. 101, Helena, MT 59601

P.O. Box 1697, Helena, MT 59624

p. (406) 443-6820

f. (406) 443-6883

Confidentiality Notice - This e-mail and its attachments (if any) may contain privileged information, confidential information, proprietary information, attorney/client work product, or other information protected from disclosure by law. Any use, dissemination, disclosure or reproduction of this e-mail other than by the intended recipient as authorized by the sender is strictly prohibited. If you have received this e-mail in error, please delete this e-mail and its attachments (if any) and notify the sender via a reply e-mail, or by telephone at (406) 443-6820. It is not the intention of the sender to waive any privileges, confidentiality rights, proprietary rights or other rights relative to the information contained within this e-mail or any of its attachments.

**Exhibit B**

Chad E. Adams
Hallee C. Frandsen
Browning, Kaleczyc, Berry & Hoven, P.C.
800 N. Last Chance Gulch, Suite 101
P.O. Box 1697
Helena, MT 59624
Telephone: (406) 443-6820
Facsimile: (406) 443-6883
chad@bkbh.com
hallee@bkbh.com

Attorneys for CoreCivic Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| NATHANIEL LAKE, | Case No. 4:21-CV-00116-BMM-JTJ |
| Plaintiff, | |
| v. | **CORECIVIC DEFENDANTS' EXPERT WITNESS DISCLOSURE** |
| CORECIVIC, LLC, d/b/a CROSSROADS CORRECTIONAL CENTER; WARDEN PAT MCTIGHE; and DOES 1-10, | |
| Defendants. | |

DEFENDANTS CoreCivic, Inc. and Warden Pat McTighe submit this

expert witness disclosure in accordance with the Court's Scheduling Order dated

January 26, 2022 which requires disclosure of all parties' liability expert witnesses

and Plaintiff's damages experts on today's date, July 25, 2022. (Doc. 16.)

1

On the issue of liability, CoreCivic, Inc. and Pat McTighe disclose the following:

    a. Ms. Tara Diaz
      Diaz Correctional Consulting
      219 E. Leland St.
      Mesa, AZ  85201
      (480) 522-6255

Ms. Diaz is a retained expert witness and will testify on the subject of liability. Ms. Diaz is anticipated to testify consistent with her attached report and CV. Ms. Diaz is expected to testify that CoreCivic and Crossroads Correctional Center staff complied with the applicable standard of care in housing Plaintiff, did not have reason to know that Plaintiff would be assaulted and were not deliberately indifferent. Ms. Diaz is also expected to testify that CoreCivic provided training to Crossroads Correctional Center staff which met or exceeded all industry standards.

    b. Non-retained hybrid experts.

Various CoreCivic and/or Crossroads Correctional Center administrators and staff may testify, in addition to fact testimony, regarding the issue of liability and compliance with applicable standards of care, policies and procedures. These persons are qualified by their experience, training and employment to testify regarding these matters. Their identities have been previously disclosed in initial disclosures and include Warden Pat McTighe, Officer Todd Horn, Camille Wandler, David Berkebile, Brent Madrid, Eric Mertz, Joe Henson, Kathleen Davis,

Nick Skarantavos and others.  Their testimony is expected to be primarily factual, but also will show that CoreCivic and its staff complied with applicable standards of care, policies and procedures in housing Plaintiff.

    c.  Damages Experts.

    CoreCivic and Warden McTighe's damages expert witnesses are not due to be disclosed for another 30 days.  However, to date CoreCivic Defendants have not received damages documentation from Plaintiff, despite initial disclosure requirements, which are sufficient to evaluate any damages claimed by the Plaintiff.  Though Plaintiff has the obligation to provide such documentation without discovery, he has not done so.  At present, written discovery requests are pending seeking damages information.  Should Plaintiff timely disclose damages expert witness(es), CoreCivic Defendants will provide expert witness disclosures and related reports related to damages.

    DATED this 25th day of July, 2022.

        BROWNING, KALECZYC, BERRY & HOVEN, P.C.

        By _____
        Chad E. Adams

        Attorneys for CoreCivic Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of July, 2022, a true copy of the foregoing was served:

Via First Class Mail and Electronic Mail to the following parties:

Melinda A. Driscoll
Fred Law Firm, PLLC
214 N. 24th Street
P.O. Box 2157
Billings, MT 59103-2157

BROWNING, KALECZYC, BERRY & HOVEN, P.C.

4

Expert Report of Tara Diaz

*Nathaniel Lake v. CoreCivic, LLC., d/b/a Crossroads Correctional Center; Warden Pat*
*McTighe; and Does 1-10* No. 4:21-cv-00116-BMM-JTJ

I.     **OVERVIEW**

I am a correctional professional who was retained by CoreCivic to render an opinion with respect to the operation of Crossroads Correctional Center ("CCC"). Specifically, whether on September 17, 2018, CoreCivic or its staff demonstrated negligence by not meeting the applicable standard of care or otherwise failed to adequately protect, leading to the assault of Nathaniel Lake ("Lake") by another inmate and to examine the living and working conditions with respect to staffing, staff training, and general security procedures.

II.     **BACKGROUND & QUALIFICATIONS**

I am a retired corrections administrator with nearly 30 years experience working a variety of correctional environments. During my tenure, I have held various line and supervisory level positions with the Arizona prison system, to include Deputy Warden, Warden, Regional Director, and Prison Operations Division Director. As the Prison Operations Division Director for the Arizona Department of Corrections, Rehabilitation and Reentry, I was responsible for the oversight and management of ten state and six private prison facilities which housed approximately 43,000 inmates. My duties and responsibilities included developing and revising policy, reviewing critical incidents to determine compliance, and taking corrective action as warranted to ensure the facilities were safe, sanitary, and secure in accordance with industry best practices and correctional standard of care. In each correctional role I held, I was responsible (at some level) for the safe, sanitary, and secure operation of the correctional facilities I managed.

My opinions are based upon my substantial experience managing, operating, and overseeing correctional institutions and presiding over a statewide prison system, including direct supervision of my subordinates who (among other things) were responsible for the safe, sanitary, and secure operation of each institution. I am experienced in sound correctional practice.

A true copy of my current resume is attached as **Exhibit A**, which lists my work experience and service as a correctional consultant. In the last two years I have been deposed as an expert witness in one case: Coyoy v. CoreCivic, Inc., No. 5:19-DV-00916-FB (W.D. Tex).

### III.   OPINIONS

1. The circumstances leading to the assault of Lake were not a result of a breach of the standard of care, negligence, or deliberate indifference on the part of CoreCivic or its agents;

2. The living and working conditions at CCC on September 17, 2018, were safe and met correctional industry standards;

3. CoreCivic CCC custody staff responsible for the supervision of Lake and Danell on September 17, 2018, consistently met or exceeded the correctional standards for staff training

### IV.   FACTS AND DATA CONSIDERED IN FORMING OPINION

I considered information from a variety of sources in the course of my work on this case. Sources included court filings submitted by both parties, video surveillance recordings, telephonic interview of staff, incident statements from both staff and inmates, staff training records, CoreCivic and applicable Montana Department of Corrections policies and procedures specific to CCC, and a voluminous number of other documents. All documents are listed in **Exhibit B**. My opinions are also based upon my familiarity with and review of American Corrections Association ("ACA") standards which are referenced herein, and my experience in reviewing incidents of inmate assaults. Such reviews were inclusive of the circumstances leading to the assault, staffing levels, staff training, policy compliance and corrective action, as warranted.

1. **Circumstances Leading to the Assault of Lake**

   It is my opinion that Danell assaulted Lake due to a belief that during recreation Lake had caused injury to one of the dogs in the prison program, and not due to neglect on the part of CoreCivic or its staff.

2

A review of video footage from September 17, 2018, shows Lake "kicking" at a black dog while on the recreation field. Lake's "kicking" action is not a hard kick to the dog, but more a means of "shooing" the dog away. After returning from recreation, Inmate Reid Danell ("Danell) was told that Lake had kicked the dog, resulting in a loss of a tooth. In a fit of rage, Danell took it upon himself to assault Lake (as per Danell's written incident statement). CoreCivic staff could not have predicted the assault by Danell as there was no indication of a conflict between the two individuals prior to the assault.

Based upon my review, the assault of Lake was not correlated to his sex offense conviction as alleged by Plaintiff's Complaint (Lake V. CoreCivic Complaint at ¶ 17.)

2. **Staffing Levels / Inmate Population**

In September 2018 CCC was operating as a 709-bed male corrections facility; 613 of those beds were contracted by the Montana Department of Corrections (MDOC). The MDOC physical inmate count on September 17, 2018, was 564. The physical count for E wing was 286 inmates.

The custody of inmates assigned to E wing was minimum unrestricted, minimum restricted, medium unrestricted and medium restricted. On September 17, 2018, Lake was classified minimum restricted, and Danell was medium/restricted based on a custody override from close custody.

In May 2018, a classification override for Danell was recommended by the unit management team with the following comments: "*Inmate Danell arrived at CCC 5/12/2015. He is complete-compliant with treatment programs. PREA remains valid as of 11/07/2015. Reid has not appeared in front of the Parole Board to date, his Parole Eligibility date is on 9/16/2034. Danell considered atypical due to being STG but is inactive. He receives satisfactory housing and work evaluation for the last three years. He has over a year and a half clear conduct. He has completed his HISET, became a mentor for CP&R, is part of the Brail Program, is the C-Pod Representative, and has multiple other programs in this last year that he was not recommended or ordered to complete. The CCC Unit Team recommends an override to Medium/Restricted. The Unit Team believes that I/M Danell can be managed at a lower custody level and has made great progress in his programing and will continue to make progress outside of the close custody unit.*" The classification was ultimately approved by "B. Reich" (Billy Reich) on who is a MDOC employee. I noted the date of approval by Mr. Reich is typed as 4/7/2018. This may well be a

3

typographical-error as the classification was completed in May 2018. MDOC classification policy was followed in granting the override in custody based on his demonstrated institutional adjustment.

Additionally, MDOC classification policy allows inmates in minimum / medium to be housed, attend recreation, meals, and programming together. This is widespread practice and policy in other corrections agencies.  It is my experience that minimum/medium custody inmates are housed in a less restrictive environment in the facility with frequent, but indirect supervision. ACA inmate classification standards speak to this.[1]

The CCC 2018 Operational Staffing Pattern allocated 169.6 total positions. Of the 169.6 positions, 36 vacancies existed according to a report generated September 24, 2018; 22 were Correctional Officer ("CO") positions.

The CCC Daily Shift Roster for September 17, 2018, day shift (6 a.m. -6 p.m.) shows all essential posts staffed.  Of the 26 CO's on shift, 7 were working overtime at the beginning of shift. Additionally, there were two shift supervisors assigned. Staffing in the housing unit where Lake and Danell resided consisted of a control room officer and two floor housing officers.

Based upon my review, essential staffing on September 17, 2018, was in accordance with the established post chart.  Additionally, the staffing pattern used for the housing area where Lake and Danell resided is congruent with other correctional agencies with matching physical plant, and inmate populations.  The established staffing levels provided the ability for staff to supervise inmates by conducting continuous movement security checks of the areas.

3. **Security Protocols**

The housing floor officers are responsible for conducting security checks on inmates in 3 different living areas, commonly referred to as "pods".  Security checks are to be conducted every

---

[1] ACA standards for classification state:  Written policy, procedure, and practice provide for a written inmate classification plan. The plan specifies the objectives of the classification system and methods for achieving them, and it provides a monitoring and evaluation mechanism to determine whether the objectives are being met.

*Comment: The classification system should consider an assessment of risk and the efficient management of the inmate population. No inmate should receive more surveillance or assistance than required or be kept in a more secure status than potential risk requires.*  See ACA standard 5-ACI-5B01, Standards for Adult Correctional Institutions, Fifth Edition.

30 minutes.  The housing floor officer is a continuous motion post as the standard of care does not require direct supervision of inmates 100% of the time.1  Per CoreCivic/CCC General Order (CoreCivic PO-00), staff are to: *Maintain inmate/ resident accountability by making frequent, irregular tours throughout the housing unit.  Be observant and visible to the inmate/resident population.*  Additionally, the post order states the following regarding security checks: *Security Checks will be conducted on each shift in a manner to prevent inmates/residents from knowing the extent and time of the check.*

The housing control room officer is a stationary post, responsible for the management of all ingress/egress of all doors within the housing unit.  The CoreCivic/CCC General Order regarding unit ingress/egress directs those inmates assigned to the unit are only allowed to access the actual pod they are assigned, unless escorted by staff.  For staff safety purposes, the officer assigned to this post additionally must maintain a visual on the housing floor officers as they conduct their duties.

Upon review of the surveillance video of E Wing from September 17, 2018, I observed inmates exiting and entering E pod.  I also observed two staff in E pod talking with inmates and then exit, approximately one minute prior to Danell entering the pod.  It appears an inmate inside E pod was talking to Danell through the window prior to his entry.  While Danell should not have been allowed enter E pod, it appears the inmate inside the pod assisted Danell to gain access.  A control room officer has limited visibility inside the pods and often communicates with inmates via the intercom system to allow inmates in/out of the pods as they exit and return from activities located elsewhere.  Despite having adequate staffing and security measures in place in compliance with the standard of care for correctional facilities, inmates may sometimes take advantage of this and slip in or out of areas they are not authorized.  When staff find inmates in unauthorized areas, the inmate is issued disciplinary.  Unfortunately, it is not possible given the manipulative nature of some inmates, as well as adequate but limited staff and resources in the prison environment, to always keep inmates from unauthorized areas.  Danell went to Lake's cell and was in E pod for three to three and a half minutes before exiting.  According to the reports, approximately 12 minutes later, staff re-entered the pod, was notified that Lake was lying on the floor of his cell, and immediately went to cell E220.  Upon finding Lake lying on the cell floor with injuries, the CO called for an emergency response team.  This was the appropriate action as additional staff and medical immediately responded.

4. **Staff Training**

CoreCivic/CCC Policy 4-1, Learning and Development was revised October 2, 2017, and meets ACA standards. Policy 4-1, section C1 requires all new employees to complete a minimum of 40-hours orientation training before taking their post.[2] New Custody employees are required to a minimum of 120 hours of training during their first year of employment.[3] In-service employees are required to complete 40-hours of training each year.[4] Each category of training specifies specific course topics that are required.

A 3-year review of training records on the CO's assigned to the housing unit where Lake resided on September 17, 2018, was conducted. Records reviewed were those of CO's Skarantavos, Horn and Davis.

CO Skarantavos completed 164.5 hours of in-service training during calendar year 2018, 95 hours in 2017, and 196 hours of pre-service training in 2016-January 2017. CO Horn completed 81.5 hours of in-service training during calendar year 2018, 206 pre-service training hours in 2017 (due to being a re-hire), and 46 in-service hours in 2016. CO Davis completed 75 in-service training hours in 2018, 57 hours in 2017, and 49 hours in 2016.

All training records demonstrate CoreCivic CCC staff met, or exceeded, ACA standards for in-service and pre-service training hours and course topics during the period reviewed.

V.    **CONCLUSION**

---

[2] ACA standards for orientation states: Written policy, procedures and practice provide that all full-time employees must complete a formalized 40-hour orientation program before undertaking their assignments. See ACA Standard 5-ACI-1D-10, Standards for Adult Correctional Institutions, Fifth Edition

[3] ACA standards for correctional officers states: Written policy, procedure, and practice provide that all new correctional officers receive 120 hours of training during their first year of employment. See ACA Standard 5-ACI-1D-12, Standards for Adult Correctional Institutions, Fifth Edition

[4] ACA standards for in-service training states: Written policy, procedure, and practice provide that all correctional officers receive at least 40 hours of annual training. See ACA Standard 5-ACI-1D-13, Standards for Adult Correctional Institutions, Fifth Edition.

It is my conclusion that CoreCivic and Crossroads Correctional Center staff complied with applicable standards of care in housing Lake; did not have reason to know that Lake would be assaulted by Danell and were not deliberately indifferent.  CoreCivic CCC has written policies and documentation related to staffing, training, inmate classification and security procedure that meet industry standards, providing a safe working and living environment for staff and inmates.  Inmates at CCC are housed and interact according to custody classifications, as allowed per MDOC and CoreCivic policy and is consistent with other correctional agency practices and policies.

My review revealed staff meet or exceed all industry standards for training.  It is my professional opinion manipulation on the part of Danell caused the assault of Lake rather than deliberate action or inaction on the part of staff, or an absence written security practices and policies.

Based on additional information becoming available, I may have additional opinions.

The foregoing is true and correct to the best of my knowledge.

Tara Diaz

July 25, 2022

Exhibit A

**Tara Diaz**

219 E. Leland St., 85201 Mesa

(480) 522-6255

mtdiazcc@gmail.com

## PROFILE

Correctional professional with almost 30 years experience in the administration of public safety programming and correctional oversight. Experience includes working at the state level providing evidence-based programming, best-practice security procedures, developing and implementing policy, contract negotiations, and the resolution of legal issues.

## WORK EXPERIENCE

Corrections Consultant / Expert Witness                                                April 2020- Current
Diaz Correctional Consultants, LLC, Mesa, Arizona

Providing corrections related consulting and expert witness services. Reviewing evidence, providing, preparing reports, and testifying as needed.  Provide general assistance in the areas of policy development, preparing requests for proposals, assessing training programs, standard compliance, safety concerns, system/process improvements including but not limited to physical plant modifications and staffing levels.

Prison Operations Division Director – Retired                                      Jul 2019 - Jan 2020
Arizona Department of Corrections, Phoenix

Responsible for the oversight and management of ten state and six private prison facilities, over 8000 staff in the classifications of correctional security, programs, facility maintenance, inmate classification and administrative support, and approximately 43,000 inmates. Served as the agency representative for all legal actions involving prison operations. Developed and revised policy as necessary to ensure industry best-practices and staff safety.

9

Regional Director                                             Jan 2013 – July 2019
Arizona Department of Corrections, statewide

Provided regional oversight and management of state and / or private contracted prison wardens
and operations. Gathered and reviewed data to make sound, data driven recommendations for
changes to facility operations and inmate management. Served as the Deputy Contract Beds
Regional Director January 2013-October 2014.


Correctional Officer – Warden                                Jul 1990 – Dec 2012
Arizona Department of Corrections, statewide

I started as a correctional officer and promoted through the security ranks to facility warden. I
Worked seven different prison complexes and every custody level, both male and female
inmates.

## EDUCATION AND OTHER BACKGROUND INFORMATION

Bachelor of Arts Interdisciplinary Studies - Criminal Justice
Northern Arizona University, Flagstaff, Arizona


Associate of Applied Science Corrections
Rio Salado College, Tempe, Arizona


Certificate of Public Administration
Arizona State University, Tempe, Arizona


Member of the American Correctional Association

## EXHIBIT B

| | |
|---|---|
| 1. | Plaintiff's Complaint |
| 2. | CoreCivic's Answer to Plaintiff's Complaint and Demand for Jury Trial |
| 3. | Plaintiff's First Amended Complaint |
| 4. | CoreCivic's Answer to Plaintiff's First Amended Complaint |
| 5. | CCC Surveillance Video of recreation yard and E Wing Housing Unit |
| 6. | Incident Statements<br>(CoreCivic/Lake000030-000043) |
| 7. | Facility Emergency Anatomical Form<br>(CoreCivic/Lake000044-000048) |
| 8. | Disciplinary Infraction Reports<br>(CoreCivic/Lake 00049-000051) |
| 9. | Escape Flyer's<br>(CoreCivic/Lake 000052-000056) |
| 10. | Photos- Inmate Allen, Kenneth<br>(CoreCivic/Lake000057-000058) |
| 11. | Photos – Inmate Danell, Reid<br>(CoreCivic/Lake000059-000060) |
| 12. | Photos – Inmate Funk, Mark<br>(CoreCivic/Lake000062-000061)<br>(CoreCivic/Lake000071) |
| 13. | Photos – Inmate Lake, Nathaniel<br>(CoreCivic/Lake000063-000068) |
| 14. | Photos – Inmate Rodriguez<br>(CoreCivic/Lake000069-000070) |
| 15. | Incident Report Packet 2018-2801-074-1<br>(CoreCivic/Lake000073-000082) |
| 16. | CoreCivic General Orders (PO-00)<br>(CoreCivic/Lake000083-000097) |
| 17. | CoreCivic Count Principles and Procedures Policy 9-13 |

| | |
|---|---|
| | (CoreCivic/Lake000098-000102) |
| 18. | CCC Daily Shift Roster 0600-1800, September 17, 2018 |
| | (CoreCivic/Lake000103-000104) |
| 19. | CCC 2018 Operational Staffing Pattern |
| | (CoreCivic/Lake000105-000107) |
| 20. | CCC Staff Vacancy Report dated 9/24/18 |
| | (CoreCivic/Lake000108) |
| 21. | Lake Classification & Orientation Records |
| | (CoreCivic/Lake000109-000149) |
| 22. | Danell Classification & Orientation Record |
| | (CoreCivic/Lake000150-000235) |
| 23. | Danell Montana Department of Corrections Disciplinary Hearings Listing |
| | (CoreCivic/Lake000236-000238) |
| 24. | Lake Montana Department of Corrections Disciplinary Hearings Listing |
| | (CoreCivic/Lake000239) |
| 25. | Montana Supreme Court decision regarding Lake criminal case |
| | (CoreCivic/Lake000240-000253) |
| 26. | Wing E Pod Control Logs |
| | (CoreCivic/Lake000254-000259) |
| 27. | CCC Wing Schematic |
| | (CoreCivic/Lake000260) |
| 28. | CoreCivic/CCC Learning and Development Policy 4-1, Effective date:10/2/2017 |
| | (CoreCivic/Lake000261-000272) |
| 29. | CoreCivic/CCC Maintenance of Training Records Policy 4-2, Effective 9-13-17 |
| | (CoreCivic/Lake000273-000276) |
| 30. | Staff Training Records (Horn, Skarvanto, and Davis) |
| | (CoreCivic/Lake000277-001459) |
| 31. | Reid Danell Classification Summary - May 2018 |
| | (CoreCivic/Lake001060-001067) |

| 32. | Montana Department of Corrections Inmate Classification Policy Eff: September 1, 1998/Revision July 12, 2016 (Confidential: Subject to Protective Order) |
|-----|------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 33. | Montana Department of Corrections Classification Handbook, June 2017 (Confidential: Subject to Protective Order) |
| 34. | CCC Unit/Pod Count Report for September 17, 2018 |
| 35. | CCC Classification Roster for September 18, 2018 |